# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO
_____

THE VILLAGE OF LOGAN,

       Plaintiff,

    V.                                  Case No. 12-CV-401 WJ/LFG

UNITED STATES DEPARTMENT OF THE
INTERIOR; THE HONORABLE KENNETH L.
SALAZAR, in his capacity as SECRETARY,
DEPARTMENT OF THE INTERIOR; THE
BUREAU OF RECLAMATION; THE
HONORABLE MICHALE L. CONNOR, in his
capacity as COMMISSIONER, THE BUREAU
OF RECLAMATION; and THE EASTERN
NEW MEXICO WATER UTILITY
AUTHORITY,

       Defendants.

## MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

THIS MATTER comes before the Court on Plaintiff Village of Logan's Motion for Preliminary Injunction **(doc. 18)**, filed July 6, 2012, seeking to prevent construction of the Eastern New Mexico Rural Water System ("the Project"), until Defendants, United States Department of the Interior; the Honorable Kenneth L. Salazar, in his Capacity as Secretary, Department of the Interior; the Bureau of Reclamation ("Reclamation"); the Honorable Michael L. Connor, in his Capacity as Commissioner, the Bureau of Reclamation; and the Eastern New Mexico Water Utility Authority ("ENMWUA"); produce an Environmental Impact Statement ("EIS").  For the reasons discussed herein, the Court finds that Defendant's motion is not well taken and shall be **DENIED**.

## BACKGROUND

Ute Reservoir ("the Reservoir") is a man-made lake located along the Canadian River in eastern New Mexico. It was originally constructed to provide water for municipal and industrial use to eastern New Mexico communities, to replace declining groundwater supply in Eastern New Mexico. It has since also become a popular destination for recreation such as boating and fishing.[1] The ENMWUA proposes to construct the Project, consisting of a pipeline and associated intake, storage, pumping, water treatment, and delivery facilities, to deliver water from the Reservoir to the eastern New Mexico municipalities of Clovis, Elida, Grady, Melrose, Portales, and Texico; Curry and Roosevelt counties; and Cannon Air Force Base. Subject to Congressional appropriation of funds, Reclamation has committed to provide federal funding to the project, with the government providing 75% of the funds and state and local entities providing 25% of the funds. To date, the government has committed approximately $3-4 million, the state has committed approximately $20 million, and local entities have committed approximately $4 million.

Pursuant to the National Environmental Policy Act ("NEPA"), Reclamation prepared an Environmental Assessment ("EA") to determine the Project's environmental impact. In the fall of 2007, Reclamation began scoping, or the process by which an agency solicits comments input from the public. The agency solicited a number of governmental entities, including New Mexico State Parks, the New Mexico Department of Game and Fish ("NMDGF"), and Quay Curry, to participate as cooperating agencies. NMDGF declined, and the other entities did not respond. Reclamation also solicited comments on issues, resource concerns, and possible impacts from

---

[1] The record does not support Plaintiff's assertion that the New Mexico legislature appropriated funds to construct the Ute Reservoir Dam based solely on the economic benefits deriving from recreational activities there. *See* Ex. A, Doc. 32-1 ("I cannot agree with the conclusion . . . that the figures presented support the economic feasibility of developing the reservoir primarily for recreation.").

representatives of local governmental entities and interest groups.  It then held public meetings in

Logan, Clovis, and Portales, seeking input from the public, interested organizations, and

agencies.  Logan's Administrator, Larry Wallin, attended the Logan meeting, but offered no

comments, nor did any other representative of the Village.  After assessing the public input,

Reclamation prepared the draft EA, focusing particularly on the area of greatest public concern,

changes to the Reservoir's water level.  The draft EA included Reclamation's Finding of No

Significant Impact ("FONSI"), which made clear that the agency did not intend to prepare an

EIS.  A public meeting was subsequently held in Logan, which the Village's Administrator again

attended, and offered no comment.

On January 27, 2011, Reclamation issued the EA, finding "there would be no significant

impacts associated with the proposed action" and that "no [EIS] will be prepared."  EA at *iv*.  On

April 17, 2012, Plaintiff filed suit, seeking a declaratory judgment that Defendants have violated

NEPA by failing to prepare an EIS, and a mandatory injunction preventing Defendants from

undertaking any work on the Project until after completing an EIS.  This motion for preliminary

injunction followed.

## LEGAL STANDARD

A "preliminary injunction is an extraordinary remedy, and . . . it should not be issued

unless the movant's right to relief is 'clear and equivocal.'"  *Heideman v. South Salt Lake City*,

348 F.3d 1182, 1188 (10th Cir. 2003) (quoting *Kikumura v. Hurley*, 242 F.3d 950, 955 (10th Cir.

2001)).  The Court may grant a temporary restraining order if the moving party shows

> (1) the movant will suffer irreparable harm unless the injunction issues; (2) there
> is a substantial likelihood[2] the movant ultimately will prevail on the merits; (3)

---

[2] In *Winter v. NRDC*, discussed in more detail below, the Supreme Court articulated this prong of the preliminary injunction standard as requiring the movant to "establish that he is likely to succeed on the merits."  555 U.S. 7, 20 (2008).  However, the Tenth Circuit has continued to require a "substantial likelihood" of success and found no conflict with *Winter*.  *See, e.g.*, *Awad v. Ziriax*, 670 F.3d 1111, 1125 (10th Cir. 2012) (citing *Beltronics USA, Inc. v.*

the threatened injury to the movant outweighs any harm the proposed injunction may cause the opposing party; and (4) the injunction would not be contrary to the public interest."

*American Civil Liberties Union v. Johnson*, 194 F.3d 1149, 1155 (10th Cir. 1999) (citing *Kiowa Indian Tribe of Oklahoma v. Hoover*, 150 F.3d 1163, 1171 (10th Cir. 1998).

## ANALYSIS

### I.   Waiver

Defendants argue that the Court should not reach the merits of Plaintiff's motion because by failing to participate in the NEPA process, it waived its right to object to the EA.  Plaintiff contends that because its claims are based on circumstances or information that arose after the NEPA process had been completed, waiver cannot apply.  This Court is not convinced that Plaintiff has justified its lack of participation in the NEPA process.  However, the Court need not resolve the waiver issue because it finds for Defendants on the merits.

It is well-established that "[p]ersons challenging an agency's compliance with NEPA must 'structure their participation so that it . . . alerts the agency to the [parties'] position and contentions,' in order to allow the agency to give the issue meaningful consideration."  *Public Citizen*, 541 U.S. at 764 (quoting *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 453 U.S. 519, 553 (1978)).  The Supreme Court has concluded, for instance, that plaintiffs who, during an administrative rule-making process, offered no comments objecting to an EA on the ground that it failed adequately to discuss potential alternatives, waived that claim for further judicial review.  *Id.*  This requirement does not hold, however, if the deficiencies in the proposed action are "so obvious that there is no need for a commentator to point them out specifically in order to preserve its ability to challenge" the action.  *Id.* at 765.

---

*Midwest Inventory Distrib., LLC*, 562 F.3d 1067, 1070 (10th Cir.2009), and *Winter*, 555 U.S. at 20).  Thus, the Court will likewise require a "substantial"  likelihood.

It is undisputed that Defendants involved the public in the EA process and notified Plaintiff of the opportunity to participate, and that Plaintiff chose not to do so. Plaintiff concedes as much in offering an affidavit from Wallin, who averred that the Village had "made a conscious decision not to take any steps to challenge the pipeline," based on its understanding of an agreement about the minimum fisheries pool. Wallin Aff., Doc. 32-12, at 3. The Village believed that it had reached an agreement with the entities with an interest in the Reservoir, including the ENMWUA, the Ute Water Commission (an organization consisting of the members of the ENMWUA and additional local entities), and the New Mexico Interstate Stream Commission ("ISC"), to increase the minimum fisheries pool from 3,741.6 above sea level[3] to 3,765 feet above sea level. However, on February 29, 2012, Wallin learned for the first time from ISC representatives that they would not agree to raise the minimum fisheries pool. Only at this point did Plaintiff object to the EA.[4]

However, Plaintiff cites no authority suggesting that its own change in circumstances alters its obligation to participate in the NEPA process. It claims that it is "axiomatic" that waiver does not apply to claims based on circumstances or information coming to light only after the NEPA process has been completed. Pl.'s Reply, Doc. 32 at 31. However, whether the ISC would agree to raise the minimum fisheries pool is not new information about the Project's environmental impact; the Project's purpose and scope remains the same regardless of Plaintiff's agreement with the ISC. The deficiencies that Plaintiff alleges plague the EA were in place when Defendants circulated the draft EA and FONSI, and at that time Plaintiff made no comment. If the Plaintiff believed the EA's analysis to be adequate when it understood the

---

[3] The level was originally set in a 1962 Memorandum of Agreement between the ISC and the State Game Commission (now the New Mexico Department of Game and Fish ("NMDGF"). EA at 5.
[4] Defendants contest the Village's understanding, submitting affidavits from ENMWUA Chairwoman Gayla Brumfield and Craig Roepke, Deputy Director of the ISC, denying that the ENMWUA or ISC ever agreed to raise the minimum pool. Second Brumfield Aff., Doc. 46-1 at 2-3; Roepke Aff., Doc. 27-1 at 14.

minimum pool level to be 3,765, it is unclear how the EA's analysis became inadequate when

Plaintiff realized its preferred minimum pool level would not be met.  Certainly, withdrawing

more water has a different environmental impact than withdrawing less water.  However, the EA

clearly referred to the original, lower minimum pool, rather than Plaintiff's preferred, higher

level.  Because Plaintiff believed that lower minimum would not be enforced does not change

Defendants' analysis of the Project's impact at that level.[5]

      Plaintiff bases some claims on information available only after the EA was completed:

2012 precipitation data from the ISC; a 2012 study of sedimentation in the Reservoir; and an

alleged expansion of the intake structure to encompass an additional lot.  The Court

acknowledges that Plaintiff has not waived its right to challenge the EA on these grounds.  With

the exception of these claims, the Plaintiff has not presented compelling reasons why its claims

should not be waived due to its failure to participate in the NEPA process.  However, the Court

need not rule on this basis, because it finds that Plaintiff's claims fail on the merits.

## II.      **Plaintiff Fails to Demonstrate a Substantial Likelihood of Success on the Merits**

      Plaintiff's motion fails because it cannot show a substantial likelihood of success on the

merits.  Defendant Interior has properly promulgated regulations addressing when an EA is

sufficient, has followed those regulations in the present case, and the EA takes a sufficiently

"hard look" at the Project's environmental impact

### A.      **NEPA's Requirements**

      Because Congress has authorized Reclamation to provide financial and technical

assistance, the Project is governed by the National Environmental Protection Act ("NEPA").

NEPA charges federal agencies with considering every significant aspect of the environmental

---

[5] Moreover, the EA clearly references the minimum fisheries pool as 3,741.6 feet above sea level.  *See, e.g.*, E.A. at 73.

impact of a proposed action.  *Baltimore Gas & Electric Co. v. Natural Res. Def. Council*, 462 U.S. 87 (1983).  Integrating this process at the earliest possible time ensures that "planning and decisions reflect environmental values."  *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 48 (2008) (quoting 40 C.F.R. § 1501.2).

NEPA directs agencies to prepare a detailed statement on the environmental impact for all "major Federal actions significantly affecting the quality of the human environment."  This statement must take a "hard look" at the project and take into account various factors: environmental impact, unavoidable adverse effects, alternatives to the proposed action, the relationship between short-term uses and long-term productivity, and irreversible commitments of resources called for by the proposal.  *Silverton Snowmobile Club v. U.S. Forest Serv.*, 433 F.3d 772, 780 (10th Cir. 2006).  NEPA imposes procedural requirements which the agency must follow, but does not mandate that agencies achieve particular substantive environmental results. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 371 (1989).

The Council on Environmental Quality ("CEQ") was formed in 1970 to promulgate regulations binding federal agencies in implementing NEPA.  42 U.S.C. § 4342; 40 C.F.R. § 1500-1508; *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  Unless an action has been categorically excluded, CEQ regulations under NEPA require agencies to prepare an EA for all major federal actions as a kind of crossroads in the compliance process. The EA is followed either by a finding that the action will have no significant impact on the human environment ("FONSI") or by the preparation of an Environmental Impact Statement ("EIS").  40 C.F.R. § 1501.4.

### 1. CEQ and Reclamation Regulations

CEQ regulations expressly define an EA as "a concise public document" that provides "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact." 40 C.F.R. § 1508.9. "The CEQ regulations allow an agency to prepare . . . an Environmental Assessment (EA), if the agency's proposed action neither is categorically excluded from the requirement to produce an EIS nor would clearly require the production of an EIS." *Dep't of Transp. v. Public Citizen*, 541 U.S. 752, 757 (2004). 40 C.F.R. § 1501.4 provides guidelines for agencies determining whether to prepare an EIS:

> [T]he Federal agency shall:
>
> (a) Determine under its procedures supplementing these regulations (described in § 1507.3) whether the proposal is one which:
>
> > (1) Normally requires an environmental impact statement, or
> >
> > (2) Normally does not require either an environmental impact statement or an environmental assessment (categorical exclusion).
>
> (b) If the proposed action is not covered by paragraph (a) of this section, prepare an environmental assessment . . . .
>
> (c) Based on the environmental assessment make its determination whether to prepare an environmental impact statement. . . .
>
> (e) Prepare a finding of no significant impact (§ 1508.13), if the agency determines on the basis of the environmental assessment not to prepare a statement.

40 C.F.R. § 1507.3 requires federal agencies to develop procedures to supplement the CEQ's regulation, including

> [s]pecific criteria for and identification of those typical classes of action:
>
> > (i)    Which normally require environmental impact statements.

8

> (ii)  Which normally do not require either an environmental impact statement or an environmental assessment (categorical exclusions (§ 1508.4)).
>
> (iii)  Which normally require environmental assessments but not necessarily environmental impact statements.

*See Lee v. U.S. Air Force*, 345 F.3d 1229, 1237 (10th Cir. 2004) ("Agencies need not prepare a full EIS . . . if they initially prepare a less detailed environmental assessment . . . and, based on the EA, issue a finding of no significant impact . . . , concluding that the proposed action will not significantly affect the environment.")

### 2.  Review of an Agency's Decision to Issue FONSI

"An agency's decision to issue a FONSI and not prepare an EIS is a factual determination which implicates agency expertise and accordingly, is reviewed under the deferential arbitrary and capricious standard of review."  *Comm. to Preserve Boomer Lake Park v. Dept. of Transportation*, 4 F.3d 1543, 1555 (10th Cir. 1993).  An agency decision will be considered arbitrary and capricious

> if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

*Colorado Wild, Heartwood v. U.S. Forest Serv.*, 435 F.3d 1204, 1213 (10th Cir. 2006) (quoting *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983)).  This review is narrow in scope, and confined to determining "whether the agency examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made."  *Id.*  This standard also requires an agency's action to be supported by "substantial evidence" in the administrative record.  *Id.*  However, this Court must not "substitute

[its] judgment for that of the agency's on matters within its expertise . . . . [and it] typically

defer[s] to the 'reasonable opinions' of agency experts in matters implicating conflicting expert

opinions." *Id.* at 1213-14.  The Plaintiff bears the burden of establishing that the Bureau's

decision to issue the FONSI was arbitrary and capricious.  *Id.*

**B.      Interior's Regulations Satisfy NEPA**

The Department of the Interior and Reclamation have each addressed § 1507.3's

requirements by producing internal guidelines for determining whether to produce an EA or an

EIS.  Interior's Departmental Manual states:

> A.      The following types of [Reclamation] proposals will normally
> require the preparation of an EIS: . . . .
>
> (5)      Proposed initiation of construction of a project or major unit
> thereof, if not already covered by an EIS, or if significant new impacts are
> anticipated. . . .
>
> B.      If, for any of these proposals, it is initially decided not to prepare
> an EIS, an EA will be prepared and handled in accordance with Section
> 1501.4(e)(2).[6]

516 DM 14.4 (Doc. 18-12, at 4).

Reclamation's own NEPA Handbook, in effect when the EA at issue was prepared,

states:

> An EA will be prepared for *all* actions except for (1) those covered by a
> [categorical exclusion], (2) those actions which have been sufficiently addressed
> by an earlier environmental document, or (3) those actions for which a decision
> has already been made to prepare an EIS.  The purpose of an EA is to allow the
> responsible Federal official to determine whether to prepare a FONSI or an EIS.

1990 Reclamation NEPA Handbook[7] (emphasis added).

---

[6] 40 C.F.R. § 1501.4 provides that an agency make the FONSI available for public review for 30 days before taking action on the proposed project.  It is undisputed that Defendants complied with this requirement.
[7] The 2012 version of the Handbook is available at http://www.usbr.gov/nepa.

Plaintiff argues that the Interior Manual's use of the term "normally" requires Reclamation to prepare an EIS, citing both Ninth Circuit precedent (*Seattle Cmty. Council Fed'n v. Fed. Aviation Admin.*, 961 F.2d 829, 832 (9th Cir. 1992)) and the CEQ regulations (40 C.F.R. § 1504.1(a)(1)).  Plaintiff concedes, however, that the Tenth Circuit applies an "arguably more relaxed approach" than the Ninth Circuit and does not recognize "normally" to be mandatory. As the Tenth Circuit stated in *Committee to Preserve Boomer Lake*, § 1501.4 "does not mean an EA and FONSI are never appropriate if an agency normally requires an EIS for a certain class of action," and "it is clear the CEQ regulations contemplate a FONSI being issued without completing an EIS, even if the project is one which 'normally' requires an EIS."  4 F.3d at 1555. *See also Colorado Wild*, 435 F.3d at 1209 ("In order to determine whether a particular proposed action requires the preparation of an EIS, agencies perform an EA. . . .  An agency may prepare an EA for one of several reasons: (1) to provide evidence and analysis that establish whether or not an EIS or a Finding of No Significant Impact ('FONSI') should be prepared . . . "); *Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1022-23 (10th Cir. 2002) ("Prior to deciding to prepare an EIS, however, an agency may prepare a less detailed document called an Environmental Assessment (EA).  An EA is used by an agency to decide 'whether to prepare an environmental impact statement or a finding of no significant impact.'  If, after completing an EA, an agency properly determines that a proposed project will not significantly impact the human environment, then the government agency issues a finding of no significant impact (FONSI) and the action may proceed, subject to administrative and judicial review." (quoting 40 C.F.R § 1508.9(a)(1)); *see also Friends of the Bow v. Thompson*, 124 F.3d 1210, 1214 (10th Cir. 1997) ("The CEQ regulations provide that an agency may prepare an EA to determine whether an EIS is necessary.").

Here, the regulations at issue clearly contemplate situations in which Reclamation initially decides not to prepare an EIS.  Therefore, Reclamation's choice not to prepare an EIS is consistent with both CEQ and Department of the Interior regulations, and is not inherently arbitrary and capricious.

The Tenth Circuit has also held that regulations stating that "normally" an EIS is required create a presumption that an EIS will be prepared, "thereby imposing on the [agency] the burden of establishing why that presumption should not apply in this particular case."  *Davis v. Mineta*, 302 F.3d 1104, 1117 (10th Cir. 2002).  Under Interior's Departmental Manual, because the Project qualifies as a "[p]roposed initiation of construction of a project" and is not already covered by an EIS, the presumption is created that an EIS will be prepared.  However, Reclamation's own handbook states that unless certain conditions are met, the agency will begin with an EA, to determine whether an EIS is necessary.  This procedure allows the agency to conserve resources by paying for the more extensive EIS only where an EA reveals that environmental impacts will be significant, and does not create a presumption that the EIS will be prepared.

Even if Interior's regulations override Reclamation's Handbook and create a presumption that an EIS would be prepared, which this Court has not found, a presumption may be rebutted.  In the NEPA context, it appears that an agency may rebut a presumption that an EIS will be prepared by showing that the EA is sufficient.  *See Davis v. Mineta*, 302 F.3d 1104, 1110 (10th Cir. 2002) (finding that an agency had not rebutted the presumption that an EIS would be prepared where the EA was deficient in methodology and conclusions).  An EA's sufficiency depends on whether it takes a "hard look" at the impacts of a proposed action, to which this Court next turns.

### C. The EA Took a Sufficiently "Hard Look" at the Project's Environmental Impact

Plaintiff challenges the EA's effectiveness by alleging that it both fails to consider important environmental impacts, and insufficiently addresses the impacts it does consider. The Court disagrees with both grounds. While Plaintiff has presented a range of experts/evidence/testimony that disagrees with Defendants' analysis, mere disagreement with an agency's conclusions does not establish that an EA is insufficient. As already stated, NEPA mandates a process, but not specific results. Plaintiff's dissatisfaction with Defendants' results does not mean that it has demonstrated a likelihood of success on the merits. Because it is well established that "agencies are entitled to rely on their own experts so long as their decisions are not arbitrary and capricious," conflicting opinions do not prove the agency failed to take a hard look. *Lee v. United States Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004). "A disagreement among experts or in the methodologies employed is generally not sufficient to invalidate an EA. . . . Courts are not in a position to decide the propriety of competing methodologies . . . but instead, should determine simply whether the challenged method had a rational basis and took into account the relevant factors." *Comm. to Preserve Boomer Lake Park*, 4.3d at 1553 (quoted in *Silverton Snowmobile Club*, 433 F.3d at 782). This Court finds that rather than proving the insufficiency of the EA, the Plaintiff has offered a battle of the experts. Consequently, it considers and rejects Plaintiff's arguments as follows.

#### 1. Impact of withdrawing 24,000 AFY.

First, Plaintiff contends that the EA fails to consider the environmental impact of withdrawing 24,000 acre-feet per year ("AFY"). However, the Project is not intended to withdraw 24,000 AFY, but 16,450 AFY. *See, e.g.*, EA at 2 ("The proposed federal action would provide funding to the [ENMWUA] to construct facilities to deliver 16,450 acre-feet (AF) of

13

water per year . . ."), 6 ("The purpose of the Proposed Action is to provide the Participating

Communities in rural eastern New Mexico a long-term sustainable water supply and to deliver,

through the Project, 16,450 AF of water annually from Ute Reservoir through 2060."), 11-12

("The total reservation of 16,450 AFY will meet all existing needs and a portion of future water

needs for the Participating Communities through the 2060 planning horizon . . ."), 13 ("[U]p to

16,450 AFY would be pumped out of the reservoir."), 26 ("The maximum withdrawal for the

[ENMWUA] is 16,540 afy."), 28 ("The annual maximum withdrawal from Ute Reservoir for the

Project would be 16,450 AFY . . .").

Admittedly, the intake structure is designed to accommodate withdrawals of up to 24,000

acre-feet per year, and the New Mexico Interstate Commission ("ISC") has contracted to sell up

to that amount.  Roepke Aff., Doc. 27-1 at 5.[8]  However, the Project as whole is designed only to

withdraw 16,450 AFY.  According to Reclamation, none of the Project's infrastructure beyond

the intake structure – that is, the pumps or transmission facilities – can accommodate more than

16,450 AFY.  Second Van Gulick Aff., Doc. 46-2 at 3.  Therefore, it is reasonable for the EA to

analyze the environmental impact of withdrawing 16,450 AFY, not 24,000.

Further, the EA addresses the impact of withdrawing 24,000 AFY as a cumulative impact

of the Project.  EA at 98-103.  NEPA requires an agency to consider "the 'cumulative impact' of

its action, which is defined as 'the impact on the environment which results from the incremental

impact of the action when added to other past, present, and reasonably foreseeable future actions

regardless of what agency (Federal or non-Federal) or persons undertakes such other actions.'"

*Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004) (quoting 40 C.F.R. § 1508.7)).

---

[8] Roepke also emphasizes that "ENMWUA does not 'inten[d] to draw water down to 3,741.6' feet elevation [the minimum fisheries pool.  Rather . . . ENMWUA is authorized to take up to 16,450 acre feet of water per year . . . . The amount of water that ENMWUA actually takes in any given year will be dependent on demand and supply." Roepke Aff., Doc. 27-1 at 10.

Because, as Plaintiff's witness James Corbin put it, "if you're going to build a structure, chances are you're going to use it someday," use of the Project intake structure to withdraw 24,000 AFY is a foreseeable future action.  Doc. 48, at 105.  *See Wilderness Workshop v. U.S. Bureau of Land Mgmt.*, 531 F.3d 1220, 1228-31 (10th Cir. 2008) (where project involved constructing a natural gas pipeline, agency properly analyzed the impact of wells that might be built to take advantage of the pipeline in future as part of the project's cumulative effects).  The EA addresses cumulative effects of withdrawing 24,000 AFY on storage, stage, depth, area, and total releases of water in the Reservoir; recreation; socioeconomics; and lakefront and lakeview property values.  EA at 98-103.  If in the future, more infrastructure is added to facilitate further withdrawals, primary analysis of the environmental impact may be undertaken then.

### 2.  Impact of sedimentation upon the Reservoir's water storage capacity.

Second, Plaintiff contends that the EA failed to address the impact of precipitation and sedimentation upon the Reservoir's water storage capacity.  It alleges that the EA relied only a 1994 ISC Precipitation Study that the ISC has itself repudiated as out of date, rather than on the most recent 2012 ISC Precipitation Study.  It also alleges that Reclamation failed to consider ISC data regarding sediment flows into the Reservoir.  The Court disagrees.

The EA addresses the effect of sedimentation on water storage in the Reservoir, and considers data from a 2002 study, the most recent available when the EA was prepared.  EA, 35-36.  Reclamation offered an affidavit and testimony from Gregory B. Gates, a professional engineer, project manager for engineering design and support services related to the Project, and regional practice lead for water resources for the western United States at CH2M HILL, a provider of consulting, design, construction, and operations services for corporations, and federal, state, and local governments.  Gates stated in developing plans for the Project, he did not

rely on the 1994 study to which Plaintiff refers, but on all available historic data at the time of analysis, which extended through 2007.  Doc. 27-9, at 4.

Further, Reclamation could not have considered a 2012 ISC sedimentation study as part of an EA published in 2011.  However, to the extent Plaintiff has stated a claim that Defendants should have supplemented the EA in light of the 2012 study, the Court disagrees.  An agency must supplement an EIS or EA if (1) "[t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns," or (2) "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. § 1502.9(d)(1)(i)-(ii).  Thus, a supplement is required when an agency receives new information that "will affect the quality of the human environment in a significant manner or to a significant extent not already considered."  *Wyoming v. United States Dep't of Agriculture*, 661 F.3d 1209, 1257 (10th Cir. 2011) (internal quotation marks and citation omitted).  After all, "[it] would be incongruous with [NEPA's] approach to environmental protection, and with the Act's manifest concern with preventing uninformed action, for the blinders to adverse environmental effects, once unequivocally removed, to be restored prior to the completion of agency action simply because the relevant proposal has received initial approval."  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371(1989).

Here, however, the Court finds that no supplementation was necessary.  Gates testified that sedimentation accumulates consistently over time, allowing projections of future sedimentation based on earlier studies, and that the accumulation projected in the EA matched the accumulation documented in the 2012 study.  Trans. Sept. 21 (Doc. 48, at 167).  *See* 40 C.F.R. § 1502.9 ("Agencies: (1) shall prepare supplements to either draft or final environmental impact statements if: (ii) There are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts.").  Because this material does not change the analysis of the Project's environmental impact, it does not require a supplement to the EA.

Plaintiff also argues that the sedimentation properly goes to the issue of volume depletion and the effects of volume depletion upon the fisheries pool, which the EA did not address. However, sedimentation does not reduce the volume of water in the Reservoir, but displaces it. While this displacement can affect the volume at a given elevation, according to Eric Frey, Northeast area fisheries manager for NMDGF, "Water volume doesn't necessarily determine the health of a fish population.  It's based on habitat and what's flooded and what the sediment is and what the prey base does" – matters that the EA does address.  Frey Dep., Doc. 39-5, at 17. Further, Craig Roepke, Deputy Director of the ISC and Bureau Chief for the Special Water Projects Bureau, averred, "I'm not aware of any study linking 3,740 feet elevation [minimum fisheries elevation], a water surface area  of 2,350 acres or storage of 50,000 acre-feet of water to the health of the fisheries in Ute Reservoir."  Roepke Aff., Doc. 27-1, at 10.

Therefore, this Court finds that the EA sufficiently addressed the impact of sedimentation.

### 3.   Failure to consider the impact of the intake structure.

Plaintiff also alleges that Defendants failed to consider the environmental impact using controlled detonation to build the intake structure itself.  Citing a deposition of Eric Frey, a field representative for NMDGF with responsibility for the Reservoir, Plaintiff raises two concerns. First, the EA does not address the possibility of turbidity, or increased solids in the water that can interfere with fish reproduction.  Frey Aff. at 41-43, Doc. 32-5 at 11-12.  Second, the EA does

not address the possibility that controlled detonation would kill protected game fish in the Reservoir. *Id.*

The decision to use controlled detonation was reached only after the EA was complete. Therefore, the EA could not have addressed these issues. To the extent that Plaintiff contends that this information requires Defendants to supplement the EA, this Court disagrees. Measures taken to mitigate environmental impact may " 'constitute an adequate buffer' against adverse impacts . . . so as to 'render such impacts so minor as to not warrant an EIS.'" *Greater Yellowstone Coalition v. Flowers*, 359 F.3d 1257, 1276-77 (10th Cir. 2004) (quoting *Wetlands Action Network v. U.S. Corps. of Engineers*, 222 F.3d 1105, 1121 (9th Cir. 2000). Here, Defendants have agreed to a number of mitigation measures. First, controlled detonation will be postponed until after spawning season, to reduce the impact of turbidity upon fish reproduction. Doc. 39-3, at 1. Second, contractors will install a "turbidity (or silt) curtain" to contain turbidity resulting from construction, consistent with state standards and approved by NMDGF. Doc. 39-2, at 2; Second Van Gulick Aff., Doc. 46-2, at 4. Third, before detonation, contractors will create a noise that scares fish away from the region affected by the detonation. Doc. 39-3, at 1. Professional engineer Paul Van Gulick, Program Manager for ENMWUA overseeing the project, averred that NMDGF had approved use of controlled detonation, and that the technique was not expected to kill any fish. Second Van Gulick Aff., Doc. 46-2 at 3-4.

Consequently, this Court finds that these mitigation techniques sufficiently minimize any impact from controlled detonation that failure to address the detonation in the EA does not require a supplemental EA or production of an EIS.

**4. Violations of Logan's Shoreline Management Plan, zoning ordinances, and restrictive covenants**.

Plaintiff argues that the EA failed to consider the project's violations of Logan's Shoreline Management Plan, zoning ordinances, and restrictive covenants.  40 C.F.R. § 1502.16(c) requires federal agencies to address "possible conflicts between the proposed action and the objectives of Federal, regional, State, and local . . . land use plans, policies, and controls for the area concerned."

Shoreline Management Plan.  Plaintiff alleges that the EA fails to consider the fact that building the intake structure violates the Shoreline Management Plan ("SMP"), a document approved on September 29, 2010, designating the shoreline of the subdivision where Defendants plan to build the intake structure as protected shoreline area.  However, this allegation fails. Mark Murphy, who was the ISC Basin Manager responsible for all ISC interests at the Reservoir until April 2010, and who wrote the SMP, averred that Defendants were aware of the SMP when drafting the EA, but did not specifically reference it in the final version on the ground that the SMP was as yet incomplete and might subsequently change.  Murphy Aff., Doc. 27-7 at 2.  He also explained that the SMP did not incorporate any data or analysis not already contained in the EA.  *Id.* at 2-3.  And Roepke stated that "Lots 11 and 12 are not designated as Protected Shoreline Areas" and "the [SMP] itself clearly contemplates the construction of the Project intake structure.  Indeed, the ENMWUA was consulted in the drafting of the Plan."  Roepke Aff., Doc. 27-1, at 11-12.  Under the SMP, Lots 11 and 12 are designated as "Prohibited Access Areas," where public access is prohibited, and expressly includes "reservoir intake structures" and "areas identified for use by [the ENMWUA]."  *Id.*

Zoning Ordinances.  The Project's intake structure is to be built on property identified as Lot 11.  In March 2012, the ENMWUA acquired property in the Village of Logan identified as

Lot 12 to use in conjunction with the intake structure.  Plaintiff alleges that the EA fails to address Plaintiff's contention that the use of Lot 12 for this purpose violates local zoning ordinances.  Because a New Mexico court has found that local zoning ordinances do not apply to the ENMWUA's activities regarding the creation of a water delivery system from the Reservoir to eastern New Mexico communities, this Court finds no deficiency in the EA's failure to address this issue, or the ENMWUA's failure to supplement the EA to address the zoning ordinances.[9]  Order Granting Def.'s Mot. to Dismiss; First Judicial District Court, County of Santa Fe, State of New Mexico, Dec. 20, 2012 (Doc. 53-1).

Restrictive covenants.  Plaintiffs also allege that the EA failed to consider that construction of the intake structure on Lot 12 violates local protective covenants.[10]  However, Lot 12 will not house the intake structure or any other building, but will allow access to the intake structure on Lot 11.  The Declaration of Protective Covenants, Doc. 18-10 at 7-9, does not expressly ban construction of an access road.  The Declaration states only that "[n]o more than one residence and connected guest house and accompanying outbuildings may be allowed per Lot," and provides limits on the nature of residences that may be built.[11]

### 4. Reasonable alternatives.[12]

Analyzing alternatives to the proposed action is "the heart" of the EIS, because it "provid[es] a clear basis for choice among options by the decisionmaker and the public."  40 C.F.R. § 1502.14.  However, an EA, a less extensive document than an EIS, need only provide "brief discussions of alternatives."  40 C.F.R. § 1508.9(b); *see also Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1246 (9th Cir. 2005) ("[W]e join our sister circuits in holding

---

[9] Plaintiff has not claimed that the zoning ordinances apply to Lot 11.
[10] Plaintiff has not claimed that the restrictive covenants apply to Lot 11.
[11] This issue is currently being litigated in state court.
[12] Because Plaintiff raised this argument for the first time in its reply memorandum (Doc. 32), the Court provided Defendants the opportunity to submit surreplies addressing it.

that an agency's obligation to consider alternatives under an EA is a lesser one than under an

EIS." (citing cases from the 2d, 4th, and 5th Circuits)).  Nor is an agency required "to analyze the

environmental consequences of alternatives it has in good faith rejected as too remote,

speculative, or . . . impractical or ineffective."  *Lee v. U.S. Air Force*, 354 F.3d 1229, 1238 (10th

Cir. 2004) (internal quotation marks and citations omitted)); *Wyoming v. U.S. Dept. of Agric.*,

661 F.3d 1209, 1244 (10th Cir. 2011) (same.)  Agencies have "considerable discretion to define"

a project's objective, and need not consider alternatives that would not fulfill that objective.

*Wyoming*, 661 F.3d at 1244.  At the same time, agencies may not "define the objectives [of a

proposed action] so narrowly as to preclude a reasonable consideration of alternatives."

*Citizens' Comm. to Save Our Canyons v. U.S. Forest Serv.*, 297 F.3d 1012, 1030 (10th Cir.

2002).

  "The Tenth Circuit has repeatedly held that agencies may limit their alternatives to the

no-action alternative and alternatives that meet the defined purpose or objective of the proposed

action."  *Wyoming*, 661 F.3d at 1246, no.25.  Other Circuits have held that CEQ regulations

mandate no minimum number of alternatives.  *See Native Ecosystems*, 428 F.3d at 1246 ("To the

extent that [the plaintiff] is complaining that having only two final alternatives—no action and a

preferred alternative—violates the regulatory scheme, a plain reading of the regulations dooms

that argument.  So long as 'all reasonable alternatives' have been considered and an appropriate

explanation is provided as to why an alternative was eliminated, the regulatory requirement is

satisfied.  In short, the regulation does not impose a numerical floor on alternatives to be

considered.")  *Cf. Davis v. Mineta*, 302 F.3d at 1122 (finding insufficient an EA that addressed

only the proposed project and no-action alternative, because the alternatives "were dismissed *in a*

*conclusory and perfunctory manner* that do[es] not support a conclusion that it was unreasonable to consider them as alternatives in the EA." (emphasis added)).

Here, the EA provides detailed analysis of the Project and a no-action alternative, and a brief summary of "Alternatives Considered, but Eliminated from Detailed Analysis."  EA at 17-34, 31 (referencing additional information in CH2M HILL's Technical Memorandum "Fresh and Brackish Groundwater Resources in the ENMRWS Project Area").  Plaintiff contends this analysis is insufficient to satisfy NEPA.  In support, it offers testimony[13] from James E. Corbin, PE, licensed as a Professional Engineer in New Mexico and Hawaii, who has twenty-five years of active duty military service in the Army Corps of Engineers and currently works as an independent consulting engineer and water resources professional.[14]  Corbin suggested six possible alternatives to the Project that Plaintiff argues was not considered in the EA.  However, Corbin also testified that he did not review the references listed in the EA, which he agreed represent resources consulted by Reclamation.  Trans. Sept. 21 (Doc. 48 at 112-13); EA at 108-114.

---

[13] Plaintiff submitted an affidavit from Corbin as an exhibit attached to its Consolidated Reply Memorandum (Doc. 32-2); Corbin also testified at the evidentiary hearing on September 21, 2012.  Defendants objected to Corbin's testimony as extra-record evidence inappropriate for this Court to consider under the Administrative Procedure Act (APA).  *See Lee v. U.S. Air Force*, 354 F.3d 1229, 1242 (10th Cir. 2004) ("While judicial review of agency action is normally restricted to the administrative record, we have recognized that consideration of extra-record materials is appropriate in 'extremely limited' circumstances, such as where the agency ignored relevant factors it should have considered or considered factors left out of the formal record.").  However, the Tenth Circuit has also concluded that "where, as is often the case in the NEPA context, we are faced with an agency's technical or scientific analysis, an initial examination of the extra-record evidence in question may aid us in determining whether" the agency ignored relevant factors it should have considered or considered factors left out of the official record.  *Id.*  Thus, this Court has considered Corbin's testimony only to the extent it aided the Court in reaching the conclusion that the EA is sufficient.  Further, because Defendants were given the opportunity to present evidence in rebuttal, and this Court rules in Defendants' favor, admission of Corbin's testimony does not prejudice Defendants.

[14] Plaintiff also submitted an affidavit from Lonny Phelps, P.E., a civil engineer familiar with the Reservoir through work on development projects in the area, proposing alternatives to the Project.  Doc. 32-3.  Because Phelps's alternatives are conclusory, and largely duplicate the alternatives proposed by Corbin, the Court does not address them separately.  *See New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683, 708-09 (10th Cir. 2006) (an agency "need not consider an alternative unless it is significantly distinguishable from the alternatives already considered").

*Demand management conservation*.  This alternative entails implementing more stringent water conservation measures to reduce demand, including incentives, graduated water rate schedules, and ordinances limiting landscape irrigation and prohibiting water waste.  Gates testified on behalf of Defendants that Reclamation had considered this alternative and that in fact, demand conservation management was already being practiced in the eastern New Mexico communities.  *See* EA at 108 (citing C2HM HILL's research memorandum "Task Order 1 – Water Conservation and Reuse in the ENMRWS Project Area").

*Use of treated effluent in conjunction with aquifer recharge*.  This "emerging technique," also known as aquifer storage and recovery ("ASR"), would entail recharging the Ogalalla aquifer with municipal wastewater treated to meet drinking water standard before being returned to the groundwater via wells or other mechanism.  Gates testified that Reclamation had considered this alternative, addressed it in a memo included in the administrative record, but concluded that it would be cost-prohibitive.  CH2M HILL Technical Memorandum, "Task Order – Summary of Decision Process for Evaluation of Alternatives for the Eastern New Mexico Rural Water System," Doc 38-4 at 5-6.

*Transfer of water rights and water use from agricultural to municipal purposes*.  This alternative would involve extracting the transferred water by wells and conveying it to existing municipal water systems without the need for treatment facilities or large-scale pipelines.  Reclamation considered this alternative and concluded that it was both cost prohibitive (due to the costs of acquiring water rights and building a system to treat and transport the water, and the impact on the region's agricultural economy) and infeasible (because even a substantial reduction in agriculture would not lead to a long-term sustainable supply).  CH2M HILL

Technical Memorandum, "Task Order 1 – Fresh and Brackish Groundwater Resources in the ENMRWS Project Area, Doc. 38-3 at 6 (cited in EA, at 108).

*Use of multiple smaller intakes instead of the preferred alternative of one intake*.  Corbin suggested that this alternative might lessen the Project's environmental impact.  Gates testified, however, that building multiple intakes would both cost more and result in a larger environmental footprint than building one intake.  Although the EA did not discuss the multiple intake proposal directly, CH2M HILL produced a technical memorandum during the process concluding that downsizing the Project infrastructure (e.g. using a smaller intake) would not significantly reduce capital costs and operating expenses.  Attachment A to "Task Order 1 – Summary of Decision Process," Doc. 38-4 at 22.

*Use of Ranney wells*.  This alternative would involve diverting water from the Canadian River below the dam through use of collector wells (also known as Ranney wells).  Reclamation concedes that it did not directly address this alternative.  Fed. Defs.' Sur-reply, at 8 (Doc. 47-8).  However, this alternative would require construction in the habitat of the Arkansas River Shriner, a small fish species listed as federally threatened, and would not reduce the amount of water needing to be withdrawn from the Reservoir.  CH2M HILL also concluded that radial wells, of which a Ranney well is a variety, were cost prohibitive.

*Diversion and treatment (desalination) of groundwater from below 2500 feet in the vicinity of the communities*.  Reclamation considered and rejected this alternative in a technical memorandum prepared by CH2M HILL and cited in the EA's list of references.  The EA concluded that this alternative did not meet the Project's needs due to "drilling and treatment cost [higher than the Project's cost], low per-well yield, . . . environmental impacts of

evaporation ponds and brine disposal," and the fact that the groundwater in question "is a limited nonsustainable resource." EA at 31.

Therefore, this Court finds that Defendants considered in good faith, and reasonably rejected, each of the above alternatives before releasing the EA.

### 5.  Adverse effects on fishing and recreation in the lake.

Plaintiff next alleges that the EA fails to sufficiently address the Project's impact on fishing and recreation.  However, "[e]conomic and social effects alone . . . do not require preparation of an EIS."  *Middle Rio Grande Conservancy Dist. V. Norton*, 294 F.3d 1220, 1229 (10th Cir. 2004) (citing 40 C.F.R. § 1508.14); *see also Ashley Creek Phosphate co. v. Norton*, 420 F.3d 934, 944 (9th Cir. 2005) (same).  Fishing and recreation at the Reservoir are fundamentally social and economic activities.  Therefore, insufficient analysis of this issue would not be fatal to the EA.  More importantly, however, the EA does address potential adverse effects on fishing and recreation.  EA at 95-96 (concluding the Project could have "a minor immeasurable impact" on the fisheries), 84-86 (concluding recreation resources in Curry and Roosevelt counties would likely improve, while annual visitation to the Reservoir in Quay county would decrease by 6 percent).  Further, the NEPA does not require that adverse effects on fishing and recreation remain below a certain level – only that the EA sufficiently address the issue.

To counter these conclusions, Plaintiff offers an affidavit from Quay County Manager Richard Primrose, attaching as an exhibit statements by Eric Frey, Northeast Areas Fisheries Manager for the NMDGF, expressing concerns about the Project's impact on access to fishing and recreation.  Primrose Aff., Doc. 18-2, at 7-8.  Plaintiff also offers a memo from David L. Propst, of the NMDGF, arguing that the Project's economic impact on local communities

required producing an EIS.[15]  These statements again prove not that Defendants failed to analyze these issues, but only that Plaintiff disagrees with their conclusions.

### 6.  Socio-economic impact on Logan and Quay County.

The EA addresses socio-economic effects at 86-90, including the costs of constructing and maintaining the Project; short term economic benefits from the creation of construction jobs; increased water fees for residents and businesses in the Project area; a loss of $500,000 to $1.5 million in revenue to Quay County resulting from decreased visitation; a loss of between 9 and 28 Quay County jobs; and a possible (but difficult to quantify) decline in property values adjacent to the Reservoir.  This analysis was based on a comparison with three local reservoirs that undergo periodic water withdrawals, and consequently experience significant variation in water elevation.  It was undertaken by Douglas J. Jeavons, the managing director of BBC Research & Consulting, an economic, financial, and market research consulting firm in Denver, who has an M.A. in Economics and twenty years of experience evaluating the socioeconomic and recreational impact of water resource projects.  Jeavons Aff, Doc. 27-8.  His affidavit states that the study undertaken was more typical of an EIS than an EA.  *Id.* at 3.

In contrast, Plaintiff offers affidavits from Warren Frost and Dick Reid, two local business owners who conclude that the EA wildly underestimates the socio-economic impact of the Project.  Docs. 18-6, 18-7.  Both affidavits assume that the Project will "drain the lake down to the level of 3,741.6 feet above sea level," or that 24,000 AFY will be removed.  Doc. 18-6 at 1.  Both also assume that doing so will "completely devastate Ute Lake as a fishing and boating destination," Doc. 18-7 at 1, and that they will be forced to close their businesses.  *Id.*  However,

---

[15] However, the Court notes that Frey's and Propst's objections to the EA did not find their way into NMDGF's official comment regarding the project, nor does Plaintiff anticipate NMDGF joining this litigation.  *See* Doc. 38-7; Trans. Sept. 21, 2012, Doc. 48, at 25:18-20.  Defendants cannot be charged with failing to consider information not presented to them, or second guessing why an agency might not have included certain internal comments.

they provide no authority for these contentions.  While the Court recognizes that these matters are of intense concern to such business owners, their analysis appears to derive from assumptions rather than economic analysis.  And, again, "[w]hen specialists express conflicting views, an agency must have discretion to rely on the reasonable opinions of its own qualified experts." *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 378 (1989).

> **7.  Greenhouse gas emissions**.

Plaintiff also alleges that Defendants failed to address the indirect effects of greenhouse gas emissions resulting from the generation of power necessary to operate the project.  In support of this contention, Plaintiff offers an affidavit from Stacy F. Tellinghuisen, a senior energy/water policy analyst employed by Western Resource Advocates in Boulder, Colorado.  Based on her extensive professional qualifications and experience, Tellinghuisen estimated that the Project would require approximately 10,671 megawatt hours of electricity per year, and would emit approximately 9,764 short tons of carbon dioxide, which she characterized as having a significant effect on the environment.  Tellinghuisen Aff., Doc. 18-3, at 2.  Plaintiff alleges that the EA fails to address this issue because it considers only the temporary increase in greenhouse gases resulting from construction.  Further, Plaintiff alleges that this failure violates CEQ regulations, citing to a CEQ memorandum, *Draft NEPA Guidance on Consideration of the Effects of Climate Change*, discussing when and how agencies should analyze the environmental effects of greenhouse gas emissions (Doc. 18-13, at 2).

However, the EA does address the Project's long-term impact on climate change, including greenhouse gas emissions, and concludes that the project would result in "no measurable changes in the composition of the atmosphere or in land use associated with the [Project]."  EA at 104.  More specifically, in response to a comment Tellinghuisen offered during

the scoping process, that an EIS was required if the Project would increase greenhouse gas emissions, the EA explains that "energy demand from the project is not anticipated to increase greenhouse gas emissions." *Id.* at Appendix C.  Rather, the Project would "replace existing energy demand from existing facilities, and would consolidate a variety of services that currently are completed [on] a community-by-community basis," such as "[w]ell completion, individual community pumping, individualized water treatment, and other water services." *Id.*

Further, Defendants correctly point out that the CEQ document on which Plaintiff relies is a draft, submitted for "public consideration and comment," and not intended to become effective "until its issuance in final form." *Id.* at 2, 12.  And even if the draft were intended as official, it identifies the "minimum level of GHG emissions that warrant some description in the appropriate NEPA analysis" as 25,000 metric tons or more of $CO_2$-equivalent greenhouse gas emissions annually. *Id.* at 1-2.  Because Tellinghuisen estimated the Project's emissions at 9,764 tons, the Project's impact falls short of that requiring NEPA analysis under the proposed CEQ guidelines.

In sum, the fact that Plaintiff and its experts disagree with Defendants' assessment of the Project's impacts as stated in the EA does not mean that Defendants did not sufficiently analyze those impacts.  Considering that qualified experts disagree on a number of the issues raised in the EA, the Court is fortunate in that NEPA does not require the Court to opine on the most effective means of resolving competing demands for scarce water resources in the northeastern part of New Mexico.  While NEPA does not mandate a specific outcome, it does allow an agency to rely on its own expert assessments provided the agency has "examined the relevant data and articulated a satisfactory explanation for its decision, including a rational connection between the facts found and the decision made," and has taken the requisite "hard look" at a proposed

28

project's environmental impact.  This required course of action is what Defendants have done in

this case.  Accordingly, Reclamation's decision, based on the EA, to issue a FONSI and not go

forward with the preparation of an EIS was not arbitrary and capricious.  Therefore, Plaintiff has

failed to satisfy the requirement of showing a substantial likelihood of success on the merits in

order to obtain a preliminary injunction.

## II.      Alternatively, Plaintiff Fails to Meet the "Substantial Questions" Standard

Plaintiff also contends that it does not need to prove a substantial likelihood of success on

the merits for a preliminary injunction to issue; rather, it can prevail under the Tenth Circuit's

more relaxed "serious questions" standard.  The current status of this standard has been called

into question.  However, assuming for the sake of this order that the "serious questions" standard

survives, the Court finds that plaintiff nonetheless fails to meet its requirements.

### A.      Status of "Substantial Questions" Standard Is Unclear

In addressing the requirement that a movant establish a substantial likelihood of success

on the merits, the Tenth Circuit, among other circuits, has articulated a more relaxed standard: if

the movant can show "that questions going to the merits are so serious, substantial, difficult, and

doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation,"

and the remaining three elements "tip strongly" in the movant's favor, the court will grant the

preliminary injunction.  *Greater Yellowstone Coalition v. Flowers*, 321 F.3d 1250, 1256 (10th

Cir. 2003).  Under this analysis, the Tenth Circuit requires a court to "look first to the three

equitable or 'harm' factors: 1) the harm that the Plaintiffs will suffer if the injunction is denied;

2) the balancing of the harm that [the defendant] will suffer if the injunction is granted; and 3)

the harm to public interest."  *Valley Cmty. Preservation Comm'n v. Mineta*, 373 F.3d 1078, 1085

(10th Cir. 2004).  Only then will the court consider whether the movant has raised sufficiently serious and substantial questions to justify the injunction.  *Id.*

Defendants contend the "serious questions" standard "does not survive" the Supreme Court's decision in *Winter v. NRDC*, 555 U.S. 7 (2008).  *Winter* addressed a preliminary injunction issued to prevent the Navy from using sonar technology in training exercises in the waters off the coast of southern California, on the grounds that the sonar would injure a number of marine mammal species living in that region.  *Id.* at 19-20.  The Ninth Circuit affirmed the district court's injunction in part because it concluded that the plaintiffs "had carried their burden of establishing a 'possibility' of irreparable injury.'"  *Id.* at 19.  The Supreme Court reversed, holding that "the Ninth Circuit's 'possibility' standard is too lenient" and that "[i]ssuing a preliminary injunction based only on the possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Id.* at 22.  In so holding, the Supreme Court reiterated that "[a] plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.

Because the *Winter* court denied the injunction based on the balance of the equities, it did not address whether the plaintiffs had established a likelihood of success on the merits, and therefore did not expressly address the standard for that element of granting a preliminary injunction.[16]  *Id.* at 23-24.  Since then, circuit courts have disagreed about whether *Winter* alters

---

[16] The District Court had found that the plaintiffs demonstrated "a probability of success" on their claims.  *Winter v. NRDC*, 555 U.S. 7, 17 (2008).

the "serious questions" test and variations thereof.[17]  In *Citigroup Global Markets, Inc. v. VCG*
*Special Opportunities Master Fund Ltd.*, the Second Circuit upheld the "serious questions"
standard, on the grounds that (1) requiring "serious" questions as well as the balance of hardship
tipping "*decidedly*" in the movant's favor created no lighter burden than under the "likelihood of
success standard; and (2) the Supreme Court's failure to comment "at all, much less negatively"
on the "serious questions" standard indicated no intent to disturb the well-established more
flexible standard.  598 F.3d 30, 35-38 (2d Cir. 2010) (emphasis in original).  The Ninth Circuit
has followed the Second.  *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1135 (9th
Cir. 2011) (noting that *Winter* can be understood "to hold that the moving party must *always*
show a probability of success on the merits (as well as a probability of injury)," but concluding
that the "serious questions" approach "survives *Winter* . . . .  so long as the plaintiff also shows
that there is a likelihood of irreparable injury and that the injunction is in the public interest."
(internal quotation marks and citations omitted; emphasis in original)).[18]

    Conversely, the Fourth Circuit has concluded that *Winter*'s express articulation that a
party seeking a preliminary injunction "must establish" the "likelihood" of success on the merits
is stricter than, and hence incompatible with, a standard requiring "only a grave or serious
*question* for litigation."  *Real Truth About Obama, Inc. v. Fed. Election Comm'n*, 575 F.3d 342,
346 (4th Cir. 2009) *cert. granted*, *judgment vacated*, 130 S. Ct. 2371, 176 L. Ed. 2d 764 (U.S.

---

[17] While a number of circuits have recognized alternatives to the "substantial likelihood of success" requirement, the
precise nature of the tests varies; however, each of these tests allows a movant, under certain circumstances, to raise
"serious questions" rather than demonstrate a likelihood of success on the merits.  *See* Bethany M. Bates,
*Reconciliation After Winter: The Standard for Preliminary Injunctions in Federal Courts*, 111 Colum. L. Rev. 1522,
1530-35 (2011).
[18] The *Alliance for the Wild Rockies* court characterizes the Tenth Circuit test as a "modified" standard, "similar to
the 'serious questions' test," requiring a movant to show only " 'questions going to the merits so serious, substantial,
difficult and doubtful, as to make the issues ripe for litigation and deserving of more deliberate investigation.'" 632
F.3d at 1134 (quoting *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1209 n.3 (10th Cir. 2009)).  However, *Valley
Cmty. Preservation Comm'n* clearly requires both serious questions and for the balance of equities to "tip strongly"
in the movant's favor, or the same test addressed in *Alliance for the Wild Rockies* and *Citigroup Global Mkts., Inc.*
373 F.3d at 1083-84.

2010) *and adhered to in part sub nom. The Real Truth About Obama, Inc. v. F.E.C.*, 607 F.3d
355 (4th Cir. 2010) (emphasis in original).

    This Court is not required to resolve this conflict, however, because it concludes that
even if the "substantial questions" standard applies, Plaintiff's claim fails.

    **B.**    **Plaintiff Cannot Show that the Three Equities "Tip Strongly" in Its Favor**

    Plaintiff has not shown a likelihood of success on the merits, nor do the equities tip
decidedly enough in Plaintiff's favor to succeed under the "serious questions" standard.
Moreover, this Court finds that public interest weighs in favor of denying the injunction.  As in
so many of these types of cases, conflicting public interests are at stake in the Project.  Certainly,
the public has a significant interest in ensuring that parties comply with environmental laws.  *See
Davis*, 302 F.3d at 1116.  However, as explained above, Defendants here have complied with
environmental laws.  A compelling public interest also exists in providing water to the eastern
New Mexico communities in question.  These communities rely entirely for their water supply
on the Ogalalla aquifer, and have historically placed a greater demand on this supply than can be
replenished by aquifer recharge, resulting in declining levels throughout the aquifer.  EA at 7.
These declining levels have increased water concentrations of arsenic, fluoride, iron, radon, total
dissolved solids, and volatile organic compounds, and Texico, Melrose, Grady, and Elida already
face difficulty complying with state and federal drinking water requirements.  *Id.* at 9.  The Court
recognizes that Village residents also have an important interest in continued recreation at the
Reservoir.  However, that interest must defer to the need for potable drinking water and for
support for municipal and irrigation purposes.  Accordingly, Plaintiff has failed to demonstrate
that the equities tip decidedly enough in Plaintiff's favor to succeed under the "serious
questions" standard.

**CONCLUSION**

For the foregoing reasons, the Court hereby **DENIES** Plaintiff's Motion for Preliminary Injunction (**doc. 18**).

**SO ORDERED.**

_____
UNITED STATES DISTRICT JUDGE